BOWES, Judge.
Plaintiff, Caldwell Sugars Co-op, Inc., filed suit requesting liquidated damages, *1010 interest and attorney’s fees for defendant’s alleged breach of a marketing agreement. After trial on the merits, the trial court rendered judgment in favor of defendant, Richard Brazan d/b/a Brazan Farms, dismissing plaintiff’s suit against him and plaintiff appealed. We affirm.
In his reasons for judgment, the trial judge set forth an extensive recitation of the facts adduced in this matter, which we adopt, with addition, as our own.
Plaintiff, Caldwell Sugars, Co-op, Inc. (“Caldwell”) operates a sugar mill near Thibodaux, Louisiana, processing sugar cane delivered by local cane farmers. Until 1984 the general manager was [Mr. Bolton]. Mr. Bolton was with Caldwell from 1973 until 1984. Sometime during 1984, Mr. Bolton left Caldwell and became the general manager at St. James Co-op. When Mr. Bolton left, Mr. Peltier became general manager at Caldwell.
Defendant Richard Brazan, Sr. (“Mr. Brazan”), is and has been a sugar cane farmer in the Vacherie area for many years. During the relevant period, he did business under the name of Brazan Farms. Mr. Brazan owned and managed the farm himself. At least one of his sons, Paul Brazan, worked on the farm, however, Paul Brazan had no ownership interest and had no authority to make management decisions. Paul Brazan’s business relationship with Mr. Brazan was that of an employee. Before 1978, Mr. Brazan delivered his cane crop to South Downs Sugars. When that company went out of business Mr. Brazan began to deliver his crop to Caldwell. Mr. Brazan signed an exclusive five year marketing agreement with Caldwell (the 1978 agreement) which provided that Mr. Brazan must deliver all sugar cane grown by him to Caldwell for a period of five years beginning with the 1978 crop. The 1978 agreement expired after delivery of the 1982 crop. A copy of the 1978 agreement was not introduced at trial, however the testimony indicated that Mr. Brazan signed the agreement and it contained the same terms as the later agreement which is at issue here.
Such marketing agreements are common in the sugar cane industry. It is not required that a farmer sign such an agreement to deliver his cane to the mill, however, it is required [his signature] for a farmer to become a member. Member farmers are eligible to share in the profits and losses of the mill operations. Non-members may deliver cane to the mill but may not share in profits and losses.
During the crop years 1978 through 1982, Mr. Brazan delivered all of his sugar cane to Caldwell as required by the 1978 agreement. After the 1978 agreement expired, a new marketing agreement was not immediately executed. During the 1983 crop year, there was no marketing agreement. Mr. Brazan delivered all of his sugar cane to Caldwell in 1983 as he done in prior years under the 1978 agreement. Both Caldwell and Mr. Brazan did business with each other exactly the same as they had in previous years.
At the end of the 1983 crop year, it was discovered at Caldwell, that Mr. Bra-zan’s 1978 agreement as well as marketing agreements with several other farms had not been renewed. Mr. Peltier prepared a new marketing agreement for Brazan Farms and hand carried it to the farm to be signed. Mr. Brazan was out of town that day and Peltier spoke to Paul Brazan. Peltier gave the marketing agreement to Paul Brazan. Paul Brazan signed it and Mr. Peltier returned the agreement (the 1984 agreement) to the mill where it was executed by Joseph Thibodaux, president of Caldwell. Paul Brazan did not inform Peltier that he had no authority to sign the agreement. Pel-tier did not ask if Paul Brazan had such authority or make any other inquiry into his authority.
It was the usual practice to mail the farmer a copy of the agreement. Mr. Brazan testified, however, that he did not received (sic) it and that he had no knowledge of the 1984 agreement until after the 1986 crop. The 1984 agreement covered the crop years 1984 through 1988. It contained a provision that if the farmer did not deliver 100% of his cane to Caldwell, the farmer would have to pay, as liquidated damages, a penalty of $1.00 per ton.
*1011 Mr. Brazan continued to deliver cane to Caldwell in 1984, 1985 and 1986 as in previous years. For each of those years, Caldwell had a loss in its operations. Notices were sent to member farmers showing their share of the losses. The notices for the 1984 crop were sent in December, 1985, for the 1985 crop in December, 1986.
Caldwell introduced copies of minutes of the stockholders meetings, apparently in an attempt to show that Mr. Brazan attended meetings immediately after the 1984 agreement was signed. Although the minutes show that Mr. Brazan did attend the 1983 stockholders meeting held on June 13, 1983, the minutes from the February 20,1984 stockholders meeting show that he did not attend that meeting. Although his name was placed in nomination for the Board of Directors at that meeting, there is no evidence to indicate that Mr. Brazan approved or was aware of his name being nominated. There is no evidence that Mr. Brazan attended any subsequent meetings.
During the 1986 crop year Caldwell suffered a mechanical failure of such a nature that it was not able to process all of the cane of its member farmers. At some point during the season, Caldwell notified its member farmers that they could bring their cane to another mill without being penalized. [Brazan signed a Growers agreement to that effect on November 22, 1986.] Mr. Brazan delivered the remainder of his cane to St. James Co-op. The next season, 1987, Mr. Brazan informed Caldwell that he intended to deliver his cane to St. James Co-op. Apparently there was a discussion between Peltier and Mr. Brazan about the 1984 agreement. Mr. Brazan told Peltier that it was not valid because it was not signed by him. Mr. Brazan delivered his 1987 and 1988 crops to St. James Co-op. Those are the last two years of the 1984 agreement. The total amount of cane delivered to St. James in 1987 was 18,-478.15 tons and in 1988, 26,859.33 tons. Caldwell filed this suit to collect the $1.00 per ton penalty provided for in the marketing agreement.
ANALYSIS
C.C. art. 1843 provides:
Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority.
An express act of ratification must evidence the intention to be bound by the ratified obligation.
Tacit ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation.
[Emphasis supplied; citations and footnote omitted].
In Nationwide Finance Co. of Gretna, Inc. v. Pitre, 243 So.2d 326, 328 (La.App. 4 Cir.1971), the court discussed the doctrine of ratification:
It is clear from the record that Mr. Pitre did not authorize his wife to sign the note on his behalf and had no knowledge of the transaction until after it occurred. While a person will be bound by his signature being executed by another person when done in his presence and under his authority, ratification must be shown when his signature is executed by another person outside of his presence and without his knowledge or authority.
For ratification of an unauthorized act, the facts must indicate a clear and absolute intent to ratify the act, and no intent will be inferred when the alleged ratification can be explained otherwise.
Nationwide Finance was adopted by this Court in First Nat. Bank of Commerce v. Ordoyne, 528 So.2d 1068 (La.App. 5 Cir.1988), writ denied, 532 So.2d 179 (La.1988).
The trial court in this case reviewed all the evidence and concluded that plaintiff failed to prove that Brazan had knowledge of the 1984 marketing agreement, and therefore without proof of such knowledge, plaintiff failed to prove that Brazan ratified the agreement.
In so ruling, the trial court, in its reasons for judgment explained its findings in detail:
Essential to a finding of ratification is that the principal had actual knowledge *1012 of the contract. Caldwell has failed to show that Mr. Brazan had actual knowledge of the agreement. Caldwell contends that the fact that Mr. Brazan continued to deliver his cane to Caldwell in 1984 through 1986 and failed at any point to disavow the agreement establishes that he knew about the agreement and ratified it. This is putting the cart before the horse. Before a person can have any reason to disavow or change his behavior based upon an event he must have knowledge of that event. Caldwell would have us believe that because Mr. Brazan continued to behave exactly the same as he had for the previous six years establishes that he was aware of a change in circumstances. Mr. Brazan’s testimony regarding this was that he believed he was still operating under the 1978 agreement, that no one had ever told him that it had expired. The Court finds Mr. Brazan’s testimony to be creditable and supported by the events of the 1983 crop year. That year it is undisputed that even though the 1978 agreement had expired and no subsequent agreement had been signed, Mr. Brazan and Caldwell conducted business as usual. Mr. Brazan delivered all of his can (sic) to Caldwell and Caldwell considered him to be a member.
This clearly indicates that Mr. Brazan would likely have delivered his cane to Caldwell whether or not he had knowledge of the 1984 agreement. Therefore, Mr. Brazan’s actions in subsequent years, continuing to do business as usual do not establish that he had knowledge of the 1984 agreement. One (sic) the contrary, Caldwell has failed to establish any facts that would indicated (sic) that Mr. Brazan had any additional knowledge in 1984,1985 or 1986 that he did not have in 1983. Ratification cannot be inferred when the actions can be otherwise explained. The Court finds that there is a reasonable explanation for Mr. Bra-zan’s action other than ratification of the 1984 agreement.
There is also a question of what benefits of the 1984 agreement did Mr. Bra-zan accept. The main benefit from being a member of a co-op is to share in its profits. Caldwell had no profits in the 1984, 1985 and 1986 crop years, so Mr. Brazan did not benefit from this. The only remaining benefit was that he was allowed to deliver his can (sic) to the mill. However, a farmer may do this even if he has no agreement with the mill and is not a member. Therefore, Caldwell has failed to establish that Mr. Brazan accepted any “benefits” from the 1984 agreement that he could not have received as a nonmember.
Finally, it appears that Mr. Brazan acted reasonably in refusing to deliver to the mill in 1987 and 1988. The 1986 breakdown had caused Mr. Brazan substantial problems and very nearly caused him to lose a large portion of his crop. Had he known about the 1984 agreement he would have been justified in not wanting to risk another breakdown and risk losing his crop in the field. Although the marketing agreement provides that a farmer must commit to delivering his crop once the mill is operational after a breakdown, the agreement also provides that the mill is not liable for any damages to the farmer for the loss of his crop if the mill cannot accept his cane. The Court finds these provisions unconscionable and that Mr. Brazan was justified in delivering his cane to St. James Co-op in 1987 and 1988.
It is well established that an appellate court may not disturb the factual findings of the trial court absent a showing that these findings are manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). A review of the entire record on appeal convinces us that the trial judge was not manifestly erroneous or clearly wrong in his factual conclusions in this case.
Caldwell argues that the trial court erred in failing to hold that defendant’s signature on a 1986 Grower’s agreement amounted to a tacit ratification of the 1984 marketing agreement, or to even discuss the agreement in its reasons for judgment.
The Grower's Agreement provides:
Pursuant [sic] to the action taken by the Board of Directors on November 21, *1013 1986, Caldwell Sugars Co-Op, Inc. is agreeable to release, on a controlled basis, to designated sugar mills from certain designated members a total of 251 tons of sugarcane. This cane tonnage shall be exempt from any penalties or liquidated damages as stipulated in my marketing agreement with Caldwell Sugars Co-Op, Inc. dated 1-17-84.
It is further agreed that this diversion of sugarcane shall be recallable in the event that good mill operations should occur, subject to the discretion of the Executive Committee.
Agreed and accepted this 11-22-86 date of November, 1986.
s/ Richard J. Brazan, Sr.
Grower
s/ S.J. Constance
Secretary-Treasurer
Caldwell Sugars Co-Op, Inc.
Caldwell also alleges that Brazan’s signature on this document is sufficient to show knowledge of the 1984 marketing agreement and is a tacit ratification of same. However, Brazan testified that he signed the agreement because he believed that he was subject to liquidated damages for failure to deliver his crop under the original 1978 agreement and he stated that “I had to sign. I’d sign anything to get out [of the 1978 agreement] because my cane was in the field.” The next year, 1987, Brazan no longer brought his crop to Caldwell, but instead delivered his sugar cane to St. James Co-op. The trial court could have, and apparently did, conclude that the 1986 agreement was not a ratification of the 1984 agreement, but was instead a notification to Brazan that he was no longer operating under the 1978 agreement. We see no manifest error in such a conclusion.
For the above discussed reasons, the judgment of the trial court is affirmed. All costs are assessed against appellants.
AFFIRMED.